# IN THE UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

HOME DEPOT U.S.A., INC.,

*Petitioner/Cross-Respondent*,

*v.*

NATIONAL LABOR RELATIONS BOARD,

*Respondent/Cross-Petitioner*.

ON PETITION FOR REVIEW
AND CROSS-APPLICATION FOR ENFORCEMENT
OF A FINAL ORDER OF THE
NATIONAL LABOR RELATIONS BOARD
CASE NO. 18-CA-273796

## OPENING BRIEF FOR PETITIONER/CROSS-RESPONDENT
## HOME DEPOT U.S.A., INC.

C. Thomas Davis
Keith D. Frazier
Brian E. Hayes
OGLETREE, DEAKINS, NASH, SMOAK
& STEWART, P.C.
401 Commerce Street
Suite 1200
Nashville, TN 37219
(615) 254-1900

Roman Martinez
Brent T. Murphy
Joseph E. Sitzmann
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200
roman.martinez@lw.com

Nicholas Rosellini
LATHAM & WATKINS LLP
505 Montgomery Street
Suite 2000
San Francisco, CA 94111
(415) 391-0600

*Counsel for Petitioner/Cross-Respondent Home Depot U.S.A., Inc.*

## SUMMARY OF THE CASE

In this case, the National Labor Relations Board entered an order forcing Home Depot to allow one of its customer-facing employees to inscribe "BLM" ("Black Lives Matter") on Home Depot's iconic orange apron, despite Home Depot's longstanding policy of prohibiting employees from displaying political or social messages on their uniforms. The primary questions presented are (1) whether, as a statutory matter, the National Labor Relations Act ("NLRA") requires Home Depot to allow the employee to display BLM, and (2) whether, as a constitutional matter, such compulsion violates Home Depot's rights under the First Amendment.

The Court should hear oral argument because this case involves novel issues about the interplay between the NLRA, the First Amendment, and the scope of employers' control over their own messages in the workplace. At least twenty minutes per side is necessary to adequately present oral argument here, though the Court's decision-making may benefit from allotting the parties thirty minutes each.

Appellate Case: 24-1406    Page: 2    Date Filed: 05/24/2024 Entry ID: 5397617

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Petitioner/Cross-Respondent Home Depot U.S.A., Inc., states that it is a wholly owned subsidiary of The Home Depot, Inc., which has no parent corporation and no publicly held corporation owns 10% or more of its stock.

Dated: May 24, 2024           */s/ Roman Martinez*
                                      Roman Martinez

Appellate Case: 24-1406   Page: 3   Date Filed: 05/24/2024 Entry ID: 5397617

# TABLE OF CONTENTS

**Page**

SUMMARY OF THE CASE ..................................................................................i

CORPORATE DISCLOSURE STATEMENT ........................................... ii

TABLE OF AUTHORITIES ....................................................................v

INTRODUCTION ....................................................................................1

JURISDICTIONAL STATEMENT ........................................................3

ISSUES PRESENTED ..............................................................................3

STATEMENT OF THE CASE...................................................................4

    A.    Home Depot And Its Company-Wide Apron Policy ...........................4

    B.    Bo's Tenure At Home Depot ...........................................................7

    C.    The ALJ's Ruling For Home Depot...................................................12

    D.    The Board's Reversal Of The ALJ......................................................14

SUMMARY OF ARGUMENT ................................................................17

STANDARD OF REVIEW .....................................................................19

ARGUMENT ..........................................................................................20

I.    THE BOARD'S ORDER IS CONTRARY TO LAW .................................20

    A.    Home Depot Uses Its Iconic Orange Aprons To Communicate Constitutionally Protected Expression ................................................20

    B.    The NLRA Does Not Invalidate Home Depot's Apron Policy ..........23

        1.    Bo's BLM Display Was Not For The Mutual Protection Of Fellow Employees ............................................................25

        2.    Bo's Display Of BLM Was Not Concerted Activity...............32

Appellate Case: 24-1406    Page: 4    Date Filed: 05/24/2024 Entry ID: 5397617

3.   Home Depot Was Justified In Enforcing Its Apron Policy, Even If Bo's Display Was Protected ............................35

C.   The First Amendment Prohibits The Board From Forcing Home Depot To Communicate A Pro-BLM Message ................................43

1.   Home Depot's Apron Policy Is Fully Protected By The First Amendment ................................44

2.   The Board's First Amendment Analysis Is Indefensible ..........50

II.   AT A MINIMUM, THE BOARD'S IMPERMISSIBLY BROAD CEASE-AND-DESIST ORDER CANNOT STAND ..................................55

CONCLUSION ................................................................60

iv

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*303 Creative LLC v. Elenis*,
   600 U.S. 570 (2023)................................................................44

*Advanced Life Systems Inc. v. NLRB*,
   898 F.3d 38 (D.C. Cir. 2018)..................................................24

*Agency for International Development v. Alliance for Open Society International, Inc.*,
   570 U.S. 205 (2013)................................................................46

*Aggregate Industries v. NLRB*,
   824 F.3d 1095 (D.C. Cir. 2016)..............................................29

*American Medical Response West*,
   370 NLRB No. 58, slip op. (2020) .........................................54

*Arc Bridges, Inc. v. NLRB*,
   861 F.3d 193 (D.C. Cir. 2017)..........................................29, 32

*Blue Circle Cement Co.*,
   311 NLRB 623 (1993) ............................................................34

*Calvin Klein Cosmetics Corp. v. Parfums de Coeur, Ltd.*,
   824 F.2d 665 (8th Cir. 1987) .......................................4, 56, 57

*Citizens United v. FEC*,
   558 U.S. 310 (2010)................................................................44

*Constellation Brands U.S. Operations, Inc. v. NLRB*,
   992 F.3d 642 (7th Cir. 2021) ............................................24, 36

*Designworks Homes, Inc. v. Columbia House of Brokers Realty, Inc.*,
   9 F.4th 803 (8th Cir. 2021) ....................................................25

*Eastern Omni Constructors, Inc. v. NLRB*,
   170 F.3d 418 (4th Cir. 1999) ..................................................35

Appellate Case: 24-1406   Page: 6   Date Filed: 05/24/2024 Entry ID: 5397617

*Eastex, Inc. v. NLRB,*
    437 U.S. 556 (1978)....................................................................3, 23, 26, 31

*Edward J. DeBartolo Corp. v. Florida Gulf Coast Building &*
    *Construction Trades Council,*
    485 U.S. 568 (1988)....................................................................................44

*Fabri-Tek, Inc. v. NLRB,*
    352 F.2d 577 (8th Cir. 1965) ..............................................................36, 37

*Federated Logistics & Operations, a Division of Federated Corporate*
    *Services, Inc. v. NLRB,*
    400 F.3d 920 (D.C. Cir. 2005)...................................................................58

*Finley Hospital v. NLRB,*
    827 F.3d 720 (8th Cir. 2016) .....................................................................19

*Frith v. Whole Foods Market, Inc.,*
    38 F.4th 263 (1st Cir. 2022)........................................................................38

*Good Samaritan Medical Center v. NLRB,*
    858 F.3d 617 (1st Cir. 2017).......................................................................29

*GSX Corp. of Missouri v. NLRB,*
    918 F.2d 1351 (8th Cir. 1990) ........................................................19, 29, 33

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston,*
    515 U.S. 557 (1995)..........................................................................*passim*

*In-N-Out Burger, Inc. v. NLRB,*
    894 F.3d 707 (5th Cir. 2018) ...........................................................39, 40, 55

*Janus v. American Federation of State, County, & Municipal*
    *Employees, Council 31,*
    585 U.S. 878 (2018)..........................................................................*passim*

*KNTV, Inc.,*
    319 NLRB 447 (1995) ................................................................................34

*Mercedes-Benz U.S. International, Inc. v. International Union, UAW,*
    838 F.3d 1128 (11th Cir. 2016) .............................................................56, 59

Appellate Case: 24-1406    Page: 7    Date Filed: 05/24/2024    Entry ID: 5397617

**Page(s)**

*Morrison-Knudsen Co. v. NLRB*,
  276 F.2d 63 (9th Cir. 1960) ...................................................................57

*Motorola, Inc.*,
  305 NLRB 580 (1991) .........................................................................26

*Nichols Aluminum, LLC v. NLRB*,
  797 F.3d 548 (8th Cir. 2015) ..............................................................29

*NLRB v. Beth Israel Hospital*,
  554 F.2d 477 (1st Cir. 1977) ...............................................................57

*NLRB v. Express Publishing Co.*,
  312 U.S. 426 (1941) .......................................................................57, 58

*NLRB v. International Longshoremen's & Warehousemen's Union,
  Local 10*,
  283 F.2d 558 (9th Cir. 1960) ..............................................................56

*NLRB v. P\*I\*E Nationwide, Inc.*,
  894 F.2d 887 (7th Cir. 1990) ..............................................................56

*NLRB v. RELCO Locomotives, Inc.*,
  734 F.3d 764 (8th Cir. 2013) ..............................................................32

*NLRB v. Starbucks Corp.*,
  679 F.3d 70 (2d Cir. 2012) .........................................3, 36, 37, 39, 55

*NLRB v. Windsor Castle Health Care Facilities, Inc.*,
  13 F.3d 619 (2d Cir. 1994) .................................................................56

*NLRB v. Yeshiva University*,
  444 U.S. 672 (1980) ...........................................................................29

*Novelis Corp. v. NLRB*,
  885 F.3d 100 (2d Cir. 2018) ...............................................................32

*Pacific Gas & Electric Co. v. Public Utilities Commission of
  California*,
  475 U.S. 1 (1986) .........................................................49, 50, 51, 53

Appellate Case: 24-1406     Page: 8     Date Filed: 05/24/2024 Entry ID: 5397617

*Pathmark Stores, Inc.*,
342 NLRB 378 (2004) ............................................................... 43

*Peyton Packing Co.*,
49 NLRB 828 (1943) ................................................................. 35

*PruneYard Shopping Center v. Robins*,
447 U.S. 74 (1980) .................................................................... 53

*Republic Aviation Corp. v. NLRB*,
324 U.S. 793 (1945) ............................................................ 35, 54

*Riley v. National Federation of the Blind of North Carolina, Inc.*,
487 U.S. 781 (1988) ............................................................ 44, 46

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*,
547 U.S. 47 (2006) ............................................................. 52, 53

*Southern New England Telephone Co. v. NLRB*,
793 F.3d 93 (D.C. Cir. 2015) ................................... 24, 35, 36, 38, 43

*Starwood Hotels & Resorts Worldwide, Inc.*,
348 NLRB 372 (2006) ............................................................... 37

*Stephens Media, LLC v. NLRB*,
677 F.3d 1241 (D.C. Cir. 2012) ................................................... 23

*Sure-Tan, Inc. v. NLRB*,
467 U.S. 883 (1984) ............................................................ 56, 59

*Telescope Media Group v. Lucero*,
936 F.3d 740 (8th Cir. 2019) ........................................ 22, 49, 51, 55

*Textile Workers Union of America v. Darlington
Manufacturing Co.*,
380 U.S. 263 (1965) ............................................. 3, 24, 35, 36, 38

*Venetian Casino Resort, L.L.C. v. NLRB*,
484 F.3d 601 (D.C. Cir. 2007) .................................................... 25

Appellate Case: 24-1406     Page: 9     Date Filed: 05/24/2024 Entry ID: 5397617

**Page(s)**

*Wooley v. Maynard*,
430 U.S. 705 (1977) .................................................................4, 49, 50

## CONSTITUTIONAL AND STATUTORY PROVISIONS

U.S. Const. amend. I ...................................................................4, 44

29 U.S.C. § 157 ................................................3, 12, 23, 25, 32

29 U.S.C. § 158 ....................................................................13

29 U.S.C. § 158(c) ..................................................................52

29 U.S.C. § 160(a) ...................................................................3

29 U.S.C. § 160(e) ..................................................................55

29 U.S.C. § 160(f) ...............................................................3, 55

## OTHER AUTHORITIES

Advice Memorandum, *Amazon.com*,
Case 19-CA-266977 (NLRB Mar. 12, 2021) ...................................27

*American Heritage Dictionary of the English Language* (5th ed. 2022) ...............32

BLM Demands, Black Lives Matter,
https://blacklivesmatter.com/blm-demands/ (last visited Apr. 22,
2024) ............................................................................8. 26

Fed. R. Civ. P. 65(d)(1) ..............................................................4

Fed. R. Civ. P. 65(d)(1)(B) ..........................................................56

Fed. R. Civ. P. 65(d)(1)(C) ..........................................................56

Guideline Memorandum Concerning Unfair Labor Practice Charges
Involving Political Advocacy, Memorandum No. GC 08-10, 2008
WL 6708138 (N.L.R.B.G.C. July 22, 2008) .........................25, 26, 31

Appellate Case: 24-1406    Page: 10    Date Filed: 05/24/2024 Entry ID: 5397617

Juliana Menasce Horowitz, *Support for Black Lives Matter Declined After George Floyd Protests, But Has Remained Unchanged Since*, Pew Rsch. Ctr. (Sept. 27, 2021), https://www.pewresearch.org/fact-tank/2021/09/27/support-for-black-lives-matter-declinedafter-george-floyd-protests-but-has-remained-unchanged-since/ ................................8

Appellate Case: 24-1406     Page: 11     Date Filed: 05/24/2024 Entry ID: 5397617

## INTRODUCTION

This case is about whether the National Labor Relations Board can force a private company to allow customer-facing employees to use company-issued uniforms to communicate personal political messages to the public, when those employees are on the job and interacting with customers on the employer's behalf. The answer is no. The National Labor Relations Act ("NLRA") does not require such compulsion, and the First Amendment forbids it.

Home Depot uses its iconic orange aprons to communicate the company's core values to the public. The aprons prominently bear Home Depot's logo and "Values Wheel," expressing the company's core values. Home Depot's message is carefully designed to make customers feel welcome. In keeping with that goal, Home Depot prohibits employees from using its aprons to convey personal views on potentially divisive issues, regardless of viewpoint.

In August 2020, Home Depot employee Cáro Linda Bo (formerly, Antonio Morales) violated Home Depot's policy by writing "BLM"—short for "Black Lives Matter"—on the company apron Bo wore while interacting with customers.[1] Bo chose that message "as a symbol of solidarity" with victims of "prejudice and racism." App.43/R.68. Home Depot responded by asking Bo to remove the BLM

---

[1] Bo, who uses they/them pronouns, recently began the process of legally changing their name. All record mentions of "Morales" refer to Bo.

1

insignia, just as it prohibited other employees from displaying political slogans like "Make America Great Again" or "Blue Lives Matter." Bo refused and later resigned.

The Board instituted enforcement proceedings against Home Depot, alleging violations of the NLRA. The Board's administrative law judge ("ALJ") ruled for Home Depot, finding that Bo's BLM display was not tied to workplace issues triggering the NLRA, but instead expressed general solidarity with the BLM movement. But the Board later reversed that well-reasoned decision, citing a purported connection between the BLM display and disputes at Bo's workplace. The Board brushed aside Home Depot's First Amendment defense and issued a cease-and-desist order directing Home Depot to permit "Black Lives Matter" displays on company aprons and to comply with the NLRA more generally.

The Board's decision is wrong on multiple levels. The NLRA protects employees' ability to band together and seek improved workplace conditions. It does *not* create an individual employee right to communicate private political views on company uniforms. Here, as the ALJ found, there is no evidence that Bo's BLM display was connected to workplace issues. The Board misinterpreted the NLRA and misconstrued the facts in holding to the contrary.

The Board's ruling also violated Home Depot's First Amendment "right to speak freely and the right to refrain from speaking at all." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 892 (2018). Under settled

2

Supreme Court precedent, the government has no power to force Home Depot to communicate, through its employee "spokesperson[s]," a message that it does not wish to express. *Id.* at 910. Home Depot's iconic orange aprons cannot be forced to serve as platforms to disseminate an employee's personal political speech.

The Court should grant Home Depot's petition, deny the Board's cross-petition for enforcement, and set aside the Board's order as contrary to law.

## JURISDICTIONAL STATEMENT

The Board had jurisdiction under 29 U.S.C. § 160(a). The Board issued its final decision and order on February 21, 2024. Home Depot timely filed a petition for review in this Court on February 27, 2024. The Board filed a cross-application for enforcement on March 12, 2024. This Court has jurisdiction under 29 U.S.C. § 160(f).

## ISSUES PRESENTED

1. Whether the NLRA forces Home Depot to allow Bo to display BLM on a Home Depot apron when serving customers on Home Depot's behalf in Home Depot stores. *See* 29 U.S.C. § 157; *Eastex, Inc. v. NLRB*, 437 U.S. 556 (1978); *Textile Workers Union of Am. v. Darlington Mfg. Co.*, 380 U.S. 263 (1965); *NLRB v. Starbucks Corp.*, 679 F.3d 70 (2d Cir. 2012).

2. Whether the First Amendment allows Home Depot to restrict political messaging displayed by its employees on Home Depot aprons when serving

3

customers on Home Depot's behalf in Home Depot stores. *See* U.S. Const. amend. I; *Janus v. Am. Fed'n of State, Cnty. & Mun. Emps., Council 31*, 585 U.S. 878 (2018); *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557 (1995); *Wooley v. Maynard*, 430 U.S. 705 (1977).

3.      Whether the Board's cease-and-desist order impermissibly extends beyond the facts of this case and amounts to an overbroad "obey-the-law" injunction. *See* Fed. R. Civ. P. 65(d)(1); *Calvin Klein Cosmetics Corp. v. Parfums de Coeur, Ltd.*, 824 F.2d 665 (8th Cir. 1987).

## STATEMENT OF THE CASE

### A.      Home Depot And Its Company-Wide Apron Policy

Home Depot is America's largest home-improvement retailer, with over 2,000 stores nationwide. App.853/R.2186; App.373/R.788. Since the company's earliest days, Home Depot associates have worn a bright orange apron—an iconic company



4

uniform that "stand[s] out like a beacon" to customers and forms an integral part of Home Depot's marketing and culture. App.563-65/R.1418-20; App.528/R.1216; *see* App.360/R.748; App.372/R.787.

The orange apron "is the brand" of Home Depot and serves crucial communicative functions. App.789/R.1907. Among other things, the apron (1) creates "uniformity in how our associates present themselves to our customer base," (2) enables customers to "quickly identify who can help" them, and (3) "plays a very integral part in who we are at Home Depot." App.370-71/R.785-86. The apron "represents the fact that when [employees] come to work" from "all walks of life," they "put on [the] uniform" and become part of "a group working toward the same goals." App.342-43/R.655-56. And it "symbolizes [Home Depot's] commitment to customer service." App.789/R.1907.

To that end, every Home Depot apron displays the Company's "Values Wheel." App.530/R.1218. This emblem describes Home Depot's eight "foundational values," including "Respect for All People" and "Taking Care of Our People." *Id.* (capitalization normalized); App.371-72/R.786-87. It tells customers "what



Appellate Case: 24-1406    Page: 16    Date Filed: 05/24/2024 Entry ID: 5397617

we're built on," App.259/R.294, and helps guide associates' on-the-job conduct, App.371-72/R.786-87.

Consistent with the apron's overriding importance to Home Depot's mission, the company has trademarked its iconic appearance. App.641/R.1726; App.382/R.837. Every Home Depot apron is owned by the company, not individual associates. *See* App.789/R.1907. Under Home Depot's apron policy, aprons may be worn only by associates while working. App.26-27/R.51-52. Aprons must remain at the store after business hours and be returned when associates leave the company. App.204-06/R.229-31.

To "present a consistent image to the public," App.789/R.1907, Home Depot has detailed standards for what "is appropriate to be [displayed] on the apron and what's not appropriate," App.373/R.788. Home Depot lets associates adorn their aprons with certain personalized messages that, in the company's judgment, advance Home Depot's expressive goals. Such messages include "[p]atriotic pins," "pictures of an associate's family members," and approved decorations celebrating certain "holidays" or career milestones. App.792/R.1910; *see* App.337/R.591; App.345/R.659; App.566-74/R.1421-29; App.789-90/R.1907-08.

Home Depot's apron policy prohibits displaying messages that constitute "discrimination or unlawful harassment," "promote or display religious beliefs," or—relevant here—advocate "causes or political messages unrelated to workplace

6

matters." App.789/R.1907. These restrictions keep customers' interactions with Home Depot focused on the company's core values and the quality of its products, while reassuring customers that Home Depot is "not trying to make any statement about [their] political views, religious views, how [they] dress, or anything else." App.372-73/R.787-88. The restrictions also minimize the potential for conflict by keeping potentially divisive or controversial displays out of Home Depot's stores. App.378-79/R.803-04. Home Depot's apron policy ultimately reflects the company's expressive judgment that "the apron is not an appropriate place" for communicating political messages to the public, and that "as a company," there are certain topics "we don't want to wade into," regardless of viewpoint. App.380/R.805; App.789/R.1907.

Home Depot regularly enforces its policies against potentially controversial messages. For example, Home Depot has prohibited employees from wearing apparel declaring "Black Lives Matter," "Blue Lives Matter," and "Make America Great Again." App.357-58/R.745-46; App.377-78/R.802-03; App.374-76/R.790-92; *infra* 38.

### B. Bo's Tenure At Home Depot

This case arises from a charge of unfair labor practices filed by a former Home Depot associate, Cáro Linda Bo. Bo worked in the flooring department of

Home Depot's New Brighton store in Minneapolis, Minnesota, from August 2020 until February 2021.  App.16-17/R.41-42; App.509/R.1188; App.578/R.1433.

1.  A few months before Bo started at Home Depot, Minneapolis was rocked by George Floyd's murder at the hands of police officer Derek Chauvin.  Floyd's killing prompted protests nationwide, especially in Minneapolis.  App.651-66/R.1769-84.  Amid the uproar, the city also experienced riots, including violence and property damage.  *Id*.

The Black Lives Matter movement (or "BLM") rose to national prominence during this period.  Founded in 2013 "in response to the acquittal of Trayvon Martin's murderer," BLM's core mission is to eradicate police violence against Black people.  App.643/R.1761.  But BLM is a decentralized social and political movement, with some segments committed not just to "trying to prevent violence or killing of African-American men by police officers," App.374/R.790, but also to more controversial goals such as "ban[ning] [Donald] Trump from future political office" and "[d]efund[ing] the police," BLM Demands, Black Lives Matter, https://blacklivesmatter.com/blm-demands/ (last visited Apr. 22, 2024) ("BLM Demands").  While many Americans support BLM, many others do not.  *See* Juliana Menasce Horowitz, *Support for Black Lives Matter Declined After George Floyd Protests, But Has Remained Unchanged Since*, Pew Rsch. Ctr. (Sept. 27, 2021),  https://www.pewresearch.org/fact-tank/2021/09/27/support-for-black-lives-

matter-declinedafter-george-floyd-protests-but-has-remained-unchanged-since/
(noting that 42% of Americans opposed BLM as of 2021).

Home Depot's New Brighton store sits just 6.5 miles from where Floyd was killed.  App.328/R.515.  In the aftermath, New Brighton employees reported a tense and volatile atmosphere.  *E.g.*, App.347-48/R.674-75; App.278-79/R.365-66.  Local unrest forced the store to close early multiple times.  App.329/R.516; App.349-50/R.680-81.

Bo first wrote BLM on their Home Depot apron in August or September 2020.  App.640/R.1631.  According to Bo, they chose to include a BLM message "as a symbol of solidarity" with the victims of "prejudice and racism."  App.43/R.68.  Another New Brighton associate, Nebiy Tesfaldet, added a BLM message to his apron in summer 2020, citing "the protests and the fresh murder of Floyd."  App.301/R.419; *see* App.299/R.417.  A third associate wore a BLM message, too.  App.305/R.438.  At the time, no one in store management noticed these BLM displays.  App.856 & n.7/R.2189 & n.7.

2.  After Bo joined Home Depot, two workplace disputes arose at the New Brighton store.  The first involved Allison Gumm, another employee in the flooring department.  App.289/R.387.  In late 2020 and early 2021, Bo, Tesfaldet, and another colleague, Sadie Ward, observed Gumm behave in a discriminatory manner at odds with Home Depot's core values.  App.58-61/R.83-86.  Gumm warned Bo to "watch

9

out" for Somali customers because, she claimed, they "tend to steal more." App.52-53/R.77-78. Gumm also allegedly refused to help customers of color; criticized Bo for entering a Spanish-speaking customer's information into a flooring department computer in Spanish; and singled Bo out for rude and unprofessional treatment in various other ways. App.854-55/R.2187-88. Ward and Tesfaldet later described similar issues. App.855/R.2188.

In mid-September 2020, Bo and Ward complained to their supervisors about Gumm's behavior. *E.g.*, *id.* The supervisors escalated those reports to human resources and store management. *Id.* Managers engaged Gumm directly and launched a full-scale investigation. *Id.* The investigation confirmed that Gumm "did not uphold [Home Depot's] values based around respect." App.339/R.623. Home Depot then terminated Gumm's employment. App.855/R.2188.

Separately, in February 2021, the New Brighton store experienced several upsetting incidents related to Black History Month. First, an unidentified person removed commemorative flash cards from the employee breakroom. App.855-56/R.2188-89. Later, someone tore down posters of famous Black figures—and then did so again the following week. *Id.* Store management made clear in all-hands emails that such conduct was unacceptable and informed associates that an investigation was underway. App.505/R.1179; App.507-08/R.1181-82.

10

3.  On February 17, 2021, Bo responded to one of management's emails, expressing dismay at the "blatant intolerance" motivating these acts.  App.613-14/R.1468-69.  That same day, Assistant Store Manager Enrique Ellis and Store Manager Jason Bergeland met with Bo.  App.856/R.2189.  Bergeland complimented Bo's "well written" email and asked if Bo wanted to help "come up with ideas for Black History Month and other heritage months."  App.144/R.169; *see* App.856/R.2189.  Bergeland also noted that he "agree[d] with a lot of what [Bo] said," App.143/R.168, and invited Bo to participate on a store diversity-and-inclusion committee, App.330-31/R.517-18.

At the end of that meeting, Bergeland noticed—for the first time—that BLM was written on Bo's apron.  App.856/R.2189.  Bergeland asked Bo to remove the BLM display because Home Depot policy prohibits private political messages, "and BLM can mean different things to different people."  App.221/R.246.  Bergeland suggested that Bo consider alternative, dress-code-compliant ways to express their views—like wearing a company-approved diversity, equity, and inclusion pin.  App.326/R.513.  Bo refused.  App.146/R.171.

The next day, Bo was invited to another meeting with District Manager Melissa Belford.  Belford told Bo that Gumm's discriminatory conduct made Belford "sick to [her] stomach" and asked Bo to provide a statement for the investigation.  App.440-41/R.1105-06;  App.445-46/R.1110-11.  Belford also

11

assured Bo that the breakroom vandalism did "not reflect" Home Depot's "core values." App.453/R.1118.

Belford then asked Bo why they had chosen to display BLM. Bo responded, "I put it on [the apron] as a signal to show that I support black people" and "people of color," given what happened "over the course of the summer [of 2020]." App.463/R.1128. Bo later added that BLM meant "respect for all people, especially black people." App.473/R.1138. Belford reiterated that Bo's BLM display violated Home Depot policy but suggested alternative ways for Bo to express their beliefs— including by wearing a pin commemorating Black History Month or diversity, equality, and inclusion. App.469-72/R.1134-37; App.476-77/R.1140-41. Bo refused to remove the BLM insignia. App.477-78/R.1142-43. Subsequent attempts to accommodate Bo failed to produce a mutually acceptable solution. App.856-58/R.2189-91.

On February 19, 2021, Bo resigned from Home Depot. App.509/R.1188.

### C.     The ALJ's Ruling For Home Depot

Shortly after resigning, Bo filed a charge with the Board alleging unfair labor practices under Sections 7 and 8 of the NLRA. App.420-21/R.1071-72. Section 7 grants employees rights to form "labor organizations," "bargain collectively," and engage in "other concerted activities" for "the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. Section 8 makes it unlawful for

12

employers "to interfere with, restrain, or coerce employees in the exercise of [Section 7] rights." *Id.* § 158.

On August 12, 2021, the Board's General Counsel filed a complaint seeking an order forcing Home Depot to allow Bo's BLM display as protected by Section 7. App.413-14/R.1059-60. The complaint did not dispute that Home Depot's apron policy is facially lawful. Home Depot responded, as relevant here, that disallowing Bo's BLM display is consistent with the NLRA, both because (1) the display was neither concerted nor for employees' mutual aid or protection, and (2) the prohibition was justified under the NLRA's "special circumstances" doctrine, which lets employers forbid an otherwise-protected message if it interferes with the employer's legitimate business objectives. Home Depot also argued that the First Amendment protects Home Depot's right to control messages expressed on company aprons.

After a four-day hearing in which Bo, Tesfaldet, and the relevant Home Depot managers all testified, the ALJ dismissed the complaint. App.864/R.2197. The ALJ first declined to treat "BLM" messaging as "inherently concerted" under the NLRA, App.859/R.2192, and concluded that "the record here does not show that [Bo's] display of the BLM message was concerted," App.862/R.2195. The ALJ found that Bo never coordinated—or even discussed—wearing BLM with fellow employees. App.862 & n.24/R.2195 & n.24. The ALJ further found that Bo's BLM display

13

"cannot reasonably be seen as a 'logical outgrowth' of the protected concerted communications regarding Gumm's misconduct and the vandalism of Black History Month displays," because "[t]he evidence does not show that those group concerns preceded [Bo's] display of the BLM message." App.862/R.2195.

The ALJ also held that the NLRA did not protect Bo's conduct because "the BLM message had, at best, an extremely attenuated and indirect relationship to any workplace issue at the New Brighton store." *Id.* The ALJ observed that BLM "originated, and is primarily used, to address the unjustified killings of black individuals by law enforcement and vigilantes." *Id.* "To the extent the message is being used for reasons beyond that," the ALJ continued, it "relates to the workplace only in the sense that workplaces are part of society." *Id.* Bo, after all, never "explicitly connect[ed] BLM" to any workplace concern. App.863/R.2196. And Bo "did not contradict" Belford when she observed "that the issues [Bo] had raised about Gumm w[ere] a 'completely separate issue from you [i.e., Bo] having the Black Lives Matter on your apron.'" App.857/R.2190.

### D. The Board's Reversal Of The ALJ

In February 2024, a divided Board reversed the ALJ's decision. Over an impassioned dissent, the Board disagreed with the ALJ's analysis of the "concerted" and "protected" elements of a Section 7 claim. The Board also rejected Home

14

Depot's alternative arguments about the NLRA's special-circumstances doctrine and the First Amendment.

1. The Board concluded that Bo's BLM display was "concerted" and "protected" under the NLRA. Even though Bo never discussed the BLM message with coworkers, the Board found that Bo's insistence on keeping the BLM insignia in mid-February 2021 was concerted because other employees "displayed BLM markings on their aprons at around the same time" as they raised complaints about Gumm and the Black History Month displays were vandalized. App.826-27/R.2159-60. The Board concluded that Bo's mid-February refusal to remove the BLM message was a "logical outgrowth" of those complaints. *Id.* The Board declined to address the General Counsel's broader argument that displaying BLM is "inherently concerted." App.828 n.23/R.2161 n.23.

The Board then determined that Bo's conduct was for mutual aid or protection under Section 7 because of a purportedly "direct relationship" between Bo's complaints about Gumm, the vandalism, and Bo's "subsequent insistence on continuing to display the BLM marking." App.828/R.2161. As support, the Board asserted that Bo had explicitly drawn such a connection "when [Bo] stated that it was 'the best way' to 'show [Bo's] support for people of color or [B]lack associates.'" App.829/R.2162 (quoting App.477/R.1142).

15

Next, the Board rejected Home Depot's argument that it had valid business justifications for prohibiting Bo's BLM display under the special-circumstances doctrine. App.830-32/R.2163-65. The Board asserted that "Home Depot's public image defense necessarily fails" because Home Depot "encourages employees to personalize their aprons." App.830/R.2163.

Finally, the Board rejected Home Depot's First Amendment defense. The Board asserted that it was Bo's "desired message that [wa]s being conveyed, not the government's"—and that requiring acceptance of the message's display on a company apron "affects what [Home Depot] must *do*," "not what [it] may or may not *say*." App.833/R.2166 (emphasis added).

Despite its fact-specific ruling about *Bo's* BLM display, the Board issued a sweeping cease-and-desist order seeming to cover *all* aspects of Section 7 compliance "at the New Brighton store." App.838/R.2171. Specifically, the Board ordered Home Depot to refrain from "[p]rohibiting its employees from engaging in protected concerted activities, including by displaying BLM or Black Lives Matter markings on their aprons" and "[a]pplying its dress code and apron policy to restrict" Section 7 rights more generally. App.838/R.2171. As a catchall, the Board further ordered Home Depot to cease and desist from "[i]n any like or related manner interfering with, restraining, or coercing employees in the exercise" of Section 7 rights. *Id.*

16

2. Board Member Kaplan dissented, finding that Home Depot's conduct did not violate the NLRA for two independent reasons. First, he explained that Bo's conduct was not concerted for NLRA purposes because "[t]here is no evidence that in displaying 'BLM' on their apron, [Bo] sought to initiate, induce, or prepare for group action." App.843/R.2176 (Kaplan, M., dissenting). Although Bo "did bring group complaints" about Gumm and the Black History Month displays "to the attention of management," Bo never connected those complaints to "displaying 'BLM' on their apron." *Id.*

Second, the dissent explained that Bo's BLM display was not for the purpose of mutual aid or protection. Citing Bo's own testimony, as well as "the temporal and geographical proximity" to "the murder of George Floyd and the ensuing widespread public awareness of the Black Lives Matter movement," the dissent concluded that "a reasonable person with knowledge of all the relevant facts would have linked [Bo's] display of 'BLM' with that movement," rather than workplace issues. App.845/R.2178; App.847/R.2180.

## SUMMARY OF ARGUMENT

Home Depot uses its iconic orange aprons to communicate a carefully crafted message to the public, one that fosters a welcoming store environment and minimizes the possibility of divisiveness and conflict. Yet the Board ordered Home Depot to let employees use Home Depot aprons to convey their own political

17

messages when interacting with customers on Home Depot's behalf. The Board's decision misinterprets the NLRA and violates the First Amendment. It should be set aside for three reasons.

*First*, the NLRA does not require Home Depot to let Bo communicate a personal political message on a Home Depot apron used when interfacing with Home Depot's customers. Bo's BLM display was neither "concerted" nor for the purpose of "mutual aid or protection" under Section 7. Just the opposite: As the ALJ correctly found, neither Bo nor anyone else connected the BLM display to workplace issues, either at the time or during the trial. A reasonable observer would not have understood Bo's message as implicating workplace issues, but rather—as Bo testified—"as a symbol of solidarity" with victims of "prejudice and racism." App.43/R.68. Plus, Home Depot's substantial business justifications for enforcing its dress code policy far outweigh any arguable interference with Bo's Section 7 rights. These "special circumstances" include preserving Home Depot's public image and avoiding risks to workplace safety and harmony, particularly given the highly charged atmosphere at the time.

*Second*, the First Amendment independently prohibits the Board from forcing Home Depot to permit the BLM display. Home Depot has a First Amendment right to communicate its own preferred message—one that is welcoming to all customers, focused on home-improvement goods, and apolitical. The Board has no power to

18

force Home Depot to alter that message. That holds true even if the BLM display at issue is also (or even solely) Bo's speech. Concluding otherwise would force employers to convey all sorts of political messages against their will, so long as the message can be connected, however tenuously, to the workplace. The First Amendment forbids that result.

*Third*, and at the very least, the Board's sweeping cease-and-desist order must be narrowed. The Board's analysis turned on the case-specific circumstances under which Bo displayed BLM at a single Home Depot store. But the Board's order appears to sweep much more broadly, amounting to an impermissible "obey-the-law" injunction. At most, Home Depot can be ordered to cease and desist from enforcing its apron policy against Bo and in substantially similar circumstances at the New Brighton store.

## STANDARD OF REVIEW

This Court reviews de novo whether the Board "correctly applied the law." *Finley Hosp. v. NLRB*, 827 F.3d 720, 723-24 (8th Cir. 2016). Although the Board's factual findings are generally reviewed for substantial evidence, *id.* at 723, this Court must "review the Board's findings more critically" where, "as here, the Board's findings are contrary to the ALJ's," *GSX Corp. of Mo. v. NLRB*, 918 F.2d 1351, 1356 (8th Cir. 1990).

19

## ARGUMENT

## I.    THE BOARD'S ORDER IS CONTRARY TO LAW

Like any speaker, Home Depot has the right to choose how to express itself—including by deciding whether, when, and how to speak on controversial subjects. The Board's order violates that right, forcing Home Depot to say something it does not want to say. This Court should interpret the NLRA in a manner that respects Home Depot's right to control the messages it conveys (or chooses not to convey) to the public, particularly given the grave constitutional questions posed by the Board's contrary reading. Alternatively, the Court should invalidate the Board's application of the NLRA to the facts here under the First Amendment.

### A.    Home Depot Uses Its Iconic Orange Aprons To Communicate Constitutionally Protected Expression

Home Depot's iconic orange apron, donned by all customer-facing associates, is synonymous with its "brand." App.789/R.1907. As explained, Home Depot uses the apron to cultivate its public image and communicate a carefully crafted message. *Supra* 4-7. The apron acts as a "billboard" for Home Depot's own expression, which Home Depot has a First Amendment right to control. App.381/R.819.

Home Depot exercises that right by imprinting the company's "Values Wheel" on its aprons, App.528/R.1216, as well as by allowing employees to personalize the aprons in limited ways consistent with those values. Within specified bounds, celebrating associates' individuality furthers Home Depot's desire

20

to cultivate a welcoming store environment.  Aprons adorned with family pictures, commemorative pins, holiday decorations, and the like serve Home Depot's communicative ends.  App.791-92/R.1909-10; App.566/R.1421.

What Home Depot has chosen *not* to say on its aprons—and what it prohibits employees from displaying there—is equally important to Home Depot's expression.  For example, Home Depot bars associates from displaying crude, harassing, or discriminatory messages.  App.790-93/R.1908-11.  In addition, Home Depot has determined that letting employees proselytize religious or political beliefs would undermine the company's expressive goals.  *See id.*  Such messages can invite disagreement and discord.  Customers (and other employees) who encounter ideological or political displays may feel unwelcome, attacked, disrespected, or excluded—precisely the opposite of what Home Depot wants to instill.

Home Depot serves millions of customers from all walks of life, spanning diverse "values," "political parties," "race[s]," and "religion[s]."  App.372/R.787. Home Depot wants customers immersed in a welcoming atmosphere—not faced with a barrage of ideological messages unrelated to Home Depot's products or the message it wants to express.  Simply put, Home Depot has chosen to preserve the integrity of its storefronts *as storefronts*—not arenas for political discourse.

The First Amendment protects Home Depot's choice to stay out of the political fray.  Like any speaker, Home Depot enjoys "both the right to speak freely

21

and the right to refrain from speaking at all." *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 752 (8th Cir. 2019). And when a Home Depot "employee engages in speech that is part of the employee's job duties, the employee's words are really the words of [Home Depot]." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 910 (2018). In that circumstance, "[t]he employee is effectively [Home Depot]'s spokesperson." *Id.*

These principles protect Home Depot's choices about what to say on its aprons, including by prohibiting customer-facing associates from displaying messages that Home Depot does not want to express. Yet the Board's order in this case forces Home Depot to disseminate such employees' personal political messages against the company's will.

If this Court upholds the Board's unprecedented decision, employers could be forced to permit all manner of political slogans on company uniforms, so long as employees (or their lawyers) can articulate any post hoc connection to workplace issues. Contentious examples are not hard to imagine: (1) "Support Workers—Vote MAGA," as a purported protest to a company's outsourcing of jobs overseas; (2) "Stop Immigration Now," as an attack on an employer's hiring practices; (3) "Eat the Rich," as a rallying cry against a company's executive-compensation scheme; (4) "Abortion Is Healthcare," as a call for a company's health insurance

policy to cover certain medical interventions; and (5) "Legalize Weed," as a plea to change a company's drug-testing policy. The possibilities are endless.

Needless to say, proliferation of controversial political or social messages in the workplace would undermine the atmosphere that Home Depot and other companies seek to cultivate. It would invite disagreement, discord, and even danger. As explained more fully below, the NLRA does not require this result—and the First Amendment forbids it.

### B. The NLRA Does Not Invalidate Home Depot's Apron Policy

The NLRA does not give employees an unfettered right to do or say whatever they please while on the job. Instead, the statute narrowly protects employees' rights to work—collectively—"to improve [their] terms and conditions of employment or otherwise improve their lot as employees." *Eastex, Inc. v. NLRB*, 437 U.S. 556, 565 (1978). Specifically, Section 7 of the NLRA protects employees' rights to: (1) form "labor organizations," (2) "bargain collectively," and (3) engage in "other concerted activities" that are "for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. This case purportedly implicates the third right—to engage in "protected concerted activity" beyond collective bargaining and union organizing. *See Stephens Media, LLC v. NLRB*, 677 F.3d 1241, 1251 (D.C. Cir. 2012). As the Board recognized, "[b]oth [1] the concertedness element and [2] the 'mutual aid or protection' element are analyzed under an objective standard."

23

App.824/R.2157; *see Advanced Life Sys. Inc. v. NLRB*, 898 F.3d 38, 44-45 (D.C. Cir. 2018).

Even when employee conduct is protected by Section 7, the NLRA is not violated when the employer has a sufficient "business justification" for its actions. *Textile Workers Union of Am. v. Darlington Mfg. Co.*, 380 U.S. 263, 269 (1965). Accordingly, under the NLRA's "special circumstances" doctrine, a company may "lawfully ban [otherwise-protected] messages on publicly visible apparel on the job when," for example, "the company reasonably believes the message may harm its relationship with its customers or its public image," *S. New England Tel. Co. v. NLRB*, 793 F.3d 93, 95 (D.C. Cir. 2015) (Kavanaugh, J.), or could "jeopardize employee safety" or "exacerbate employee dissension," *Constellation Brands U.S. Operations, Inc. v. NLRB*, 992 F.3d 642, 646 (7th Cir. 2021).

Enforcing Home Depot's apron policy to prohibit Bo's BLM display does not violate the NLRA. Bo's display was not "protected," because it expressed a political statement unrelated to workplace concerns. It was not "concerted," because it did not seek to initiate group action among Bo's fellow employees. And regardless, Home Depot was justified in applying its apolitical apron policy to protect its public image, enhance the customer experience, and avoid tangible risks to workplace safety and harmony.

24

### 1. Bo's BLM Display Was Not For The Mutual Protection Of Fellow Employees

Bo's display of BLM after George Floyd's murder was clearly not for the "mutual aid or protection" of fellow employees. 29 U.S.C. § 157. The Board committed legal and factual error in concluding otherwise.

a. To satisfy the mutual-protection requirement, the General Counsel must demonstrate "a 'nexus' between [Bo's] activity and 'employees' interests as employees.'" *Venetian Casino Resort, L.L.C. v. NLRB*, 484 F.3d 601, 606 (D.C. Cir. 2007). That demands more than an "attenuated" connection to workplace issues. *Id.* Section 7's explicit protection of employees' right to form "labor organizations" and "bargain collectively" informs the meaning—and limits the reach—of the provision's catchall phrase "mutual aid or protection." 29 U.S.C. § 157. Indeed, under the interpretive canon of *noscitur a sociis*, courts must "avoid ascribing to one word a meaning so broad that it is inconsistent with the accompanying words" in the statute. *Designworks Homes, Inc. v. Columbia House of Brokers Realty, Inc.*, 9 F.4th 803, 808 (8th Cir. 2021).

The Board itself has long acknowledged that Section 7's nexus requirement is especially demanding for political activity. To be protected, such activity must be "'directly related' to working conditions." Guideline Mem. Concerning Unfair Labor Practice Charges Involving Political Advocacy, Memorandum No. GC 08-10, 2008 WL 6708138, at *3 (N.L.R.B.G.C. July 22, 2008) ("2008 Opinion") (quoting

*Motorola, Inc.*, 305 NLRB 580, 580 n.1 (1991)). There must be "a *direct* nexus between the *specific* issue that is the subject of the advocacy and a *specifically identified* employment concern." *Id.* (emphasis added).

b. Here, there is no direct nexus between Bo's BLM display and Home Depot "employees' interests as employees." *Eastex*, 437 U.S. at 567. As the ALJ found, a reasonable person would perceive the BLM insignia as conveying a social or political message, not one about workplace conditions at the New Brighton store. To the extent "the BLM message can be seen as implicating employment issues," the ALJ correctly explained, "it is only because that expanded meaning amounts to a broad political or social justice message." App.860/R.2193.

The genesis of BLM, the events that catapulted BLM to national prominence, and BLM's own messaging all confirm that Bo's BLM display had nothing to do with workplace issues. As explained, BLM was founded to eradicate police violence against Black communities. *Supra* 8. George Floyd's murder spotlighted precisely that issue, particularly in Minneapolis during summer and fall 2020. *Id.* Even the more controversial goals expressed by some segments of BLM—such as "[d]efund[ing] the police"—generally relate to the same core goal. *See* BLM Demands, *supra*. Accordingly, few would associate BLM with employment issues. App.847/R.2180 (Kaplan, M., dissenting).

That understanding mirrors the General Counsel's own view of BLM. The General Counsel has previously concluded that showing support for BLM is *not* a protected activity. *See* Advice Memorandum at 8, *Amazon.com*, Case 19-CA-266977 (NLRB Mar. 12, 2021) (describing "Black Lives Matter" as an "unprotected employee solicitation[]"). The General Counsel's witnesses in this case agreed. *E.g.*, App.309/R.444.

Even Bo conceded that the BLM display was unrelated to workplace issues. At trial, Bo testified that BLM was "a symbol of solidarity" with victims of "prejudice and racism." App.43/R.68. Bo also told Belford about displaying BLM "as a signal to show that I support black people." App.463/R.1128. Moreover, Bo began displaying a BLM message shortly after beginning work at Home Depot, *before* raising complaints about Gumm's behavior or the Black History Month vandalism. App.38-40/R.63-65. And when they resigned, Bo did not connect the BLM display to either workplace incident. App.509/R.1188.

So too for Bo's coworkers, including those who displayed BLM messages on company aprons (but agreed to remove them upon request). Tesfaldet testified that he wore BLM out of "sympath[y]" for the "stress and high emotions" many experienced following Floyd's murder. App.301/R.419. Ward likewise testified that she understood BLM as "work[ing] to bring to light systemic injustices and

systems of oppression[] that affect primarily African-Americans." App.263-64/R.338-39; *see* App.280/R.371.

In the end, the ALJ found that "[n]o one—not [Bo], other employees, supervisors, or managers—testified that they understood [Bo's] display of the BLM message to relate to Gumm's conduct, the vandalism, or any other complaints regarding employees' treatment *qua* employees at the New Brighton store." App.863/R.2196. That dearth of testimony aligns with all the objective evidence demonstrating that BLM is commonly understood as protesting police brutality against people of color, not commenting on workplace conditions. The ALJ thus correctly found that "the BLM message had, at best, an extremely attenuated and indirect relationship to any workplace issue at the New Brighton store." App.862/R.2195. That is not enough under Section 7.

c. The Board nonetheless posited a link between Bo's BLM message and workplace issues. App.828-29/R.2161-62. The Board asserted that "[n]either the origins of 'BLM messaging,' nor its primary use, dictate how the BLM marking may be used or understood." App.829/R.2162. The Board also claimed that the ALJ "erred by discounting the evidence" purportedly showing that Bo's BLM display "was to further protest racial discrimination at [Home Depot's] store and [Home Depot's] failure to adequately address it." *Id.* But it was the Board—not the ALJ—

28

that misconstrued the record. And regardless, the Board's legal conclusion is flatly inconsistent with the NLRA.

"Where, as here, the Board's findings are contrary to the ALJ's," this Court must "review the Board's findings more critically." *GSX Corp.*, 918 F.2d at 1356. The Court does "not owe deference" to the Board for decisions based on "conclusory rationales." *Id.* at 1358 (quoting *NLRB v. Yeshiva Univ.*, 444 U.S. 672, 691 (1980)); *accord Arc Bridges, Inc. v. NLRB*, 861 F.3d 193, 196 (D.C. Cir. 2017) (no deference "when the Board fails adequately to explain why it has rejected the arguments for a different understanding of the evidence"). Thus, while the Board may "choose between fairly conflicting views of the evidence," it may not resort to "suspicion, surmise, implications, or plainly incredible evidence." *Nichols Aluminum, LLC v. NLRB*, 797 F.3d 548, 553 (8th Cir. 2015). Nor may the Board "rely on an oversimplified view of the facts" or "refus[e] to credit probative circumstantial evidence." *Aggregate Indus. v. NLRB*, 824 F.3d 1095, 1100 (D.C. Cir. 2016) (alteration in original). Here, the Board justified overruling the ALJ only by improperly "distort[ing] the fair import of the record" and "ignoring whole segments of uncontroverted evidence." *Good Samaritan Med. Ctr. v. NLRB*, 858 F.3d 617, 628 (1st Cir. 2017).

The Board found the requisite nexus based solely on the assertion that Bo "specifically" connected "New Brighton workplace racial issues" to Bo's "refusal to

cease displaying the BLM insignia at the February 18 meeting" with Belford. App.829 n.26/R.2162 n.26. But as the ALJ recognized, even "[t]he General Counsel concede[d]" that Bo "'did not explicitly connect BLM to any particular incident with Gumm.'" App.862/R.2196 (quoting General Counsel's brief). Indeed, when asked directly about the BLM display—both during the Belford meeting and at the administrative hearing—Bo consistently emphasized a general desire to express "solidarity" with Black people and oppose "prejudice and racism." *See* App.43-45/R.68-70; App.212-13/R.237-38; App.246-47/R.271-72; App.463/R.1128; App.509/R.1188. The ALJ thus correctly found that Bo's BLM message was distinct from workplace concerns, observing that Bo never disputed that the BLM display "was a 'completely separate issue' from the complaints about Gumm." App.862/R.2195. Rightly so: Bo *admitted* the BLM display was a generalized signal of "support [for] black people" after "what happened over the course of the summer [of 2020]" in Minneapolis and across the country, not a specific statement about what occurred at the New Brighton store months later—as any reasonable observer would have understood. App.463/R.1128.

The Board glossed over this, asserting that Bo "stated" they refused to remove their BLM display during the February 18 meeting with Belford because the display was "the best way" to show "support for people of color or [B]lack associates." App.829/R.2162 (quoting App.477/R.1142). But even that does not directly tie the

30

BLM display to "prior concerted protests of racially discriminatory working conditions." App.827/R.2160; *see* App.42-43/R.67-68; App.384-92/R.861-69. A vague, generalized expression "support" for people of color or Black associates falls far short of the requisite connection to employees' interests *as employees*. The NLRA requires a "direct nexus" between employee advocacy and concrete, specific workplace concerns. *See* 2008 Opinion, 2008 WL 6708138, at *3; *Eastex*, 437 U.S. at 567. Bo's BLM display cannot satisfy that test as a matter of law, because it did not draw a connection to any *specific* workplace issue. App.463/R.1128. The Board was wrong to interpret the NLRA to cover any employee statement that could arguably be construed as tangentially relating to workplace concerns.[2]

All this establishes that Bo's BLM display was exactly what any reasonable observer would have understood—a general social or political statement. It was not about workplace disputes at the New Brighton store, and it was not protected by Section 7. The Board's contrary holding rested on a basic misunderstanding of the

---

[2] The Board also failed to mention that the language it quoted from the February 18 meeting was from *Belford's* question to Bo: "You don't think that there's any other way that you could show your support for people of color or black associates[?]" App.477/R.1142. Bo responded, "There's plenty of other ways, but this is the best way." *Id.* This vague exchange cannot possibly trump the many other instances—in Bo's conversation with Belford and Bo's hearing testimony—in which Bo made clear that the BLM display was meant to express general solidarity with Black people (a category obviously including "[B]lack associates"), not to protest workplace conditions. *Supra* 27.

direct-nexus test and failed to "adequately explain" its rejection of the ALJ's well-supported factual findings. *Arc Bridges*, 861 F.3d at 196.

## 2. Bo's Display Of BLM Was Not Concerted Activity

Section 7 protects only "concerted" activity. 29 U.S.C. § 157. The word "concerted" means "[p]lanned or accomplished *together*." *Concerted*, *American Heritage Dictionary of the English Language* (5th ed. 2022) (emphasis added). Accordingly, Section 7 protects only activities that are "engaged in with or on the authority of other employees, and not solely by and on behalf of the employee himself." *NLRB v. RELCO Locomotives, Inc.*, 734 F.3d 764, 785 (8th Cir. 2013). In limited circumstances, action "of individual employees" can qualify—but only "if it 'represents either a continuation of earlier concerted activities or a logical outgrowth of concerted activities.'" *Id.* At bottom, concerted activities must have "some relation to group action in the interest of the employees," *id.* at 785-86, and must be "engaged in with the object of initiating or inducing group action," *Novelis Corp. v. NLRB*, 885 F.3d 100, 108 (2d Cir. 2018).

Bo's BLM display was not concerted. It was a unilateral act in support of the BLM movement—not any continuation of, or precursor to, group activity at the New Brighton store. As the ALJ found, the "evidence does not establish that [Bo] and other employees had discussed the possibility of [Bo] displaying the BLM message, or that other employees had encouraged that display, at the time [Bo] wrote BLM on

32

the work apron." App.862/R.2195. "Nor does the evidence show that other employees subsequently informed [Bo] that they approved of, or supported, [Bo's] display of the message." *Id.*

The Board rejected that well-supported finding based on a belief that Bo's BLM display was a "logical outgrowth of the employees' prior concerted activities"—i.e., their complaints about Gumm's misconduct and the Black History Month vandalism. But again, Bo's BLM display began before any of the later concerted activities, *supra* 27, and the Board's sole support is its erroneous assertion that Bo "articulated [a] connection between [Bo's] display of BLM and [those] group concerns" at the February 18 meeting with Belford by purportedly indicating a general desire to show support for "people of color or *[b]lack associates*," App.827/R.2160 (emphasis added) (quoting App.477/R.1142). As explained, that "conclusory rationale[]" misconstrues the record and flouts established law. *GSX Corp.*, 918 F.2d at 1358; *see supra* 29-32 & n.2.

Even on its own terms, the Board's explanation shows only that Bo linked the BLM display—which began before any concerted action as to the Gumm or Black History Month incidents—to a general desire to support "[B]lack associates." App.829/R.2162. That unilateral expression of support for coworkers was not tied to Gumm or the Black History Month vandalism, and it is not a logical outgrowth of "concerted" activity under Section 7. The Board was wrong to characterize it as "an

33

attempt to bring 'truly group complaints to the attention of management.'" App.828 n.23/R.2161 n.23. Treating such a vague statement of support for Black associates as having a sufficient nexus to (unmentioned) complaints distorts the facts and exceeds any legitimate bounds of the "logical outgrowth" doctrine.

To support its holding, the Board relied on *KNTV, Inc.*, 319 NLRB 447 (1995), which found that one employee's request for a pay raise for a subset of company employees was a logical outgrowth of an earlier conversation the employee had with coworkers about a general wage increase for *all* employees. App.836 n.40/R.2169 n.40. But in *KNTV*, the logical connection between (1) the employee's requested wage increase, and (2) his prior group conversation about wage increases, was obvious. *Id.* The same was true in the Board's other cited case, *Blue Circle Cement Co.*, 311 NLRB 623, 633-34 (1993), which found that an employee's printing of an article attacking the employer's plan to burn hazardous waste was the logical outgrowth of that same employee's earlier participation in protests about the same plan. As in *KNTV*, the connection in *Blue Circle* was direct and unmistakable.

Here, by contrast, Bo *never drew* any connection between the BLM display and the Gumm and Black History Month incidents—and nothing suggests that Bo's general desire to support people of color (including Black associates) was implicitly tied to those episodes. The Board's attempt to shoehorn these facts into the "logical outgrowth" doctrine stretches that doctrine beyond recognition.

34

### 3. Home Depot Was Justified In Enforcing Its Apron Policy, Even If Bo's Display Was Protected

Even if Bo's conduct were somehow protected by Section 7, Home Depot would still prevail under NLRA. That is because employees' Section 7 rights are "not absolute." *E. Omni Constructors, Inc. v. NLRB*, 170 F.3d 418, 424 (4th Cir. 1999). Under Section 8(a)(1), this Court must "balance 'the employee's protected right against any substantial and legitimate business justification that the employer may give for the infringement.'" *Id.* at 423. Section 8(a)(1) is violated "only when the interference with [Section] 7 rights outweighs the business justification for the employer's action." *Darlington*, 380 U.S. at 269. And when it comes to "prohibiting" conduct "during working hours," an employer's actions "must be presumed to be valid." *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 803 n.10 (1945) (quoting with approval *Peyton Packing Co.*, 49 NLRB 828, 843 (1943)).[3]

These "long recognized" principles—sometimes discussed as the "'special circumstances' doctrine"—require "balanc[ing] the potentially conflicting interests of an employee's right to display union insignia [or other protected messages] and an employer's right to limit or prohibit such display." *S. New England*, 793 F.3d at 95-96; *see Republic Aviation*, 324 U.S. at 798. Such balancing ensures the NLRA

---

[3] The Board was therefore wrong to assert that Home Depot's enforcement of its apron policy during business hours was "presumptively unlawful," such that Home Depot bore "the burden of proof" to demonstrate otherwise. App.830/R.2163.

Appellate Case: 24-1406    Page: 46    Date Filed: 05/24/2024 Entry ID: 5397617

does not "prevent an employer from making and enforcing reasonable rules covering the conduct of employees on company time." *Fabri-Tek, Inc. v. NLRB*, 352 F.2d 577, 586 (8th Cir. 1965). "Working time," after all, "is for work." *Id.*

Valid business justifications thus let companies ban "messages on publicly visible apparel on the job" when, for example, "the company reasonably believes the message" may (1) "harm its relationship with its customers or its public image," *S. New England*, 793 F.3d at 95, (2) "jeopardize employee safety," or (3) "exacerbate employee dissension," *Constellation Brands*, 992 F.3d at 646. All three rationales protect Home Depot's decision to prohibit the BLM display.[4]

a. Home Depot relies on its iconic orange aprons to communicate a carefully crafted message and bolster its public image. *Supra* 4-7. Home Depot has a substantial and legitimate business interest in prohibiting messages on its aprons that would undermine those efforts, one that clearly outweighs any arguable Section 7 interest Bo had in the BLM display.

Consider *NLRB v. Starbucks Corp.*, 679 F.3d 70 (2d Cir. 2012), where the Second Circuit rejected Section 7 liability in similar circumstances. There, "pro-union employees" resisted Starbucks's limitation on their ability to wear

---

[4] These three categories are merely illustrative. The ultimate Section 8(a)(1) question under *Darlington* is whether "the interference with [Section] 7 rights outweighs the business justification for the employer's action," whatever that justification may be. 380 U.S. at 269.

"pro-union" buttons on company uniforms. *Id.* at 72. The Board sided with the employees, reasoning that pro-union buttons "did not seriously harm" Starbucks's "image" because the buttons "were 'no more conspicuous than the panoply of other buttons employees displayed'" there—and because Starbucks "not only countenanced but encouraged employees to wear multiple buttons as part of that image." *Id.* at 77. The Second Circuit overturned that ruling, holding that the Board went "too far in invalidating Starbucks's" dress code policy. *Id.* at 78. "Starbucks is clearly entitled to oblige its employees to wear buttons promoting its products," the court explained, "and the information contained on those buttons is just as much a part of Starbucks's public image as any other aspect of its dress code." *Id.* The special-circumstances doctrine therefore allowed Starbucks to prohibit "distraction from its [chosen] messages," including workplace-related speech by its employees that the NLRA otherwise protects. *Id.*; *accord Fabri-Tek*, 352 F.2d at 586; *Starwood Hotels & Resorts Worldwide, Inc.*, 348 NLRB 372, 372-73 (2006).

Home Depot, like Starbucks, has a right to preserve the integrity of the carefully curated public image communicated on its aprons. And here, Home Depot's justification for prohibiting the BLM display is far more compelling. Bo did not display anything that has "long been recognized" as NLRA-protected activity. *Starbucks*, 679 F.3d at 77. Instead, Bo displayed an overtly political slogan

far removed from the NLRA's core concerns, making it especially clear that Bo's interest here cannot "outweigh[]" Home Depot's. *Darlington*, 380 U.S. at 269."

"[R]ightly or wrongly," many members of the public—including some customers and employees of any large enterprise—see BLM "as a controversial message." *Frith v. Whole Foods Mkt., Inc.*, 38 F.4th 263, 275 (1st Cir. 2022); *see* App.378/R.803 (certain aspects of BLM are potentially "divisive"); *supra* 8-9 (42% disapproval). Bo's display, moreover, happened amid significant racial tension and civil unrest, just miles from the murder that precipitated it. *Supra* 9. In that environment, Home Depot reasonably feared that permitting Bo's BLM display would distort the company's apolitical message, just like other employees' efforts to display the slogans "Blue Lives Matter" and "Make America Great Again" would. *See* App.329/R.516; App.348/R.675; App.374-75/R.790-91; *see* App.353/R.685 (New Brighton store employee prohibited from wearing pro-law enforcement "Thin Blue Line" pin). The timing and geography of these events, paired with the content of Bo's display, make this a paradigmatic case for applying the special-circumstances doctrine. *E.g.*, *S. New England*, 793 F.3d at 95 (holding that AT&T could lawfully prohibit employees from wearing shirts referencing "recent and widely publicized" murders). Bo's weak Section 7 interest in displaying BLM cannot overcome these business imperatives, particularly given the numerous dress-code-compliant alternatives available to Bo. App.326/R.513.

Appellate Case: 24-1406    Page: 49    Date Filed: 05/24/2024 Entry ID: 5397617

The Board disagreed, noting that Home Depot "does not require employees to wear standardized aprons, but instead encourages employees to extensively personalize them." App.830/R.2163. The Second Circuit rejected an analogous argument in *Starbucks*, holding that Starbucks's "encourage[ment]" of certain personalized displays was "just as much a part of Starbucks's public image as any other aspect of its dress code." 679 F.3d at 78. And here, the record flatly contradicts the Board's assertion that Home Depot does not require "standardized" aprons. Although Home Depot allows some personalization of company aprons, it strictly limits that practice to ensure that any such personalization supports, rather than distorts, Home Depot's desired message. *Supra* 6-7.[5] There is an unmistakable connection between Home Depot's apron policy, the personalized expression the company permits, and the apolitical message it seeks to convey.

The Board was wrong to analogize this case to *In-N-Out Burger, Inc. v. NLRB*, 894 F.3d 707 (5th Cir. 2018). *See* App.830/R.2163. There, the Fifth Circuit rejected In-N-Out's argument that its claimed interest "in maintaining consistent, unadorned employee uniforms" justified prohibiting an employee from wearing buttons

---

[5]    The Board's observation that Home Depot has allowed "insignia and slogans of professional or college sports teams," certain "holiday symbols," "Pan-African flag colors," and "LGBTQ Pride symbols" is beside the point. App.830/R.2163. The Board has no power to second guess Home Depot's expressive judgment about which displays further its desired public image. *See infra* 43-49.

supporting a $15 minimum wage. 894 F.3d at 716. That court reasoned that In-N-Out had not, in fact, followed a rigid "'no pins or stickers' rule"—and instead *required* employees to wear buttons in some circumstances. *Id.* at 716-17. Moreover, the *In-N-Out* button, which endorsed a $15 minimum wage, advocated core NLRA workplace concerns. *Id.* at 712. That situation is quite different from this case. Home Depot's core interest is not principally in the *consistency* of the messages conveyed on company aprons, but rather—and more importantly—in ensuring that any substantive messaging on the apron is apolitical and noncontroversial. App.789/R.1907; App.372-73/R.787-88; App.378/R.803. And any connection between Bo's BLM message and workplace conditions was highly attenuated at best. *Supra* 25-28.

The Board was similarly wrong to opine that customers would not attribute Bo's BLM display to Home Depot, and would instead "assume that the markings on any particular employee's apron reflect the sentiments of the employee wearing it." App.831/R.2164. That reasoning ignores that Bo wore the apron when communicating with customers on Home Depot's behalf—and that the apron indisputably conveys Home Depot's message in various other ways. *Supra* 4-7. As the Supreme Court has explained, when an "employee engages in speech that is part of the employee's job duties, the employee's words are really the words of the employer." *Janus*, 585 U.S. at 910.

40

The Board's analysis also disregards the record. Bo and Tesfaldet agreed that if they saw a Home Depot associate displaying, say, a swastika on their apron, it would show that Home Depot "endorses" and "condon[es]" that hateful symbol. App.205/R.230; App.307/R.442. Their core point—that customers and other employees hold Home Depot responsible for messages displayed on Home Depot aprons by on-the-job Home Depot employees—is obviously correct.

b. Home Depot's well-founded concerns about maximizing workplace safety and minimizing employee dissension further justified prohibiting Bo's BLM message. Political disputes can—and often do—spur people to behave aggressively, even violently. The BLM movement is no exception, particularly during the summer and fall of 2020. To cite just two publicly reported examples from that period, Target encountered a shopper who screamed at an employee wearing a "Black Lives Matter" mask that she "needed to take it the f--- off [her] face," App.676-80/R.1794-98, and a Starbucks customer yelled "F--- Black Lives Matter" at employees, App.776-85/R.1894-1903.

Home Depot, for its part, had seen even worse: In May 2016, a Home Depot employee at a Staten Island store wore an "America Was Never Great" hat while on the job, in violation of Home Depot policy. App.667-75/R.1785-93; App.376/R.792. The employee received death threats, and multiple people came to

41

the store to confront her. *Id.* She ultimately had to be transferred "from Staten Island to another store for her own safety." *Id.*

Safety concerns were top of mind at the New Brighton store during Bo's tenure, given the volatile atmosphere following George Floyd's murder. *E.g.*, App.278-79/R.365-66. The store sits just miles from where Floyd was killed, within a shopping center where looting and rioting occurred. App.328-29/R.515-16; App.359/R.747. Indeed, Home Depot was forced to close the New Brighton store early six times during this period. App.854/R.2187; App.329/R.516.

Tensions ran high among employees as well. Bo overheard coworkers expressing that they "did not approve of the BLM letters" and "had concerns about" the BLM movement. App.203/R.228; App.195/R.220. Ward overheard similar comments about BLM. App.281-82/R.372-73. And one New Brighton employee wanted to wear a "Thin Blue Line" pin—a pro-law enforcement slogan generally understood as opposing BLM—to express support for his son, a police officer charged with guarding the home of Floyd's killer during the unrest in Minneapolis. App.351-53/R.683-85. Home Depot denied that employee permission to wear the pin. App.353/R.685. Letting Bo display BLM, while prohibiting the "Thin Blue Line" pin, risked inciting resentment or even conflict.

The Board dismissed Home Depot's serious business concerns about workplace safety and employee dissension as "[]speculative," insufficiently

42

"imminent," and inadequately supported. App.831-32/R.2164-65. The Board asserted a lack of "evidence that any of [Home Depot's] employees have been confronted over BLM insignia or any evidence of any customer-employee confrontation at the New Brighton store with respect to any insignia," while emphasizing that "several New Brighton employees displayed BLM markings on their apron for months without ever being confronted by any customer." App.831/R.2164. That reasoning violates the Board's own precedent, which is crystal clear that an employer need not wait for risks to materialize to invoke the special-circumstances doctrine. *See Pathmark Stores, Inc.*, 342 NLRB 378, 379 (2004). Rather, an employer can show special circumstances "even in the absence of evidence of actual harm." *Id.*; *accord S. New England*, 793 F.3d at 96. Home Depot did not need to run the risks demanded by the Board's decision.

Home Depot's substantial and legitimate business interests in enforcing its apolitical apron policy far outweighed any arguable Section 7 interest Bo had in displaying BLM. The Board erred in rejecting Home Depot's special-circumstances defense.

### C. The First Amendment Prohibits The Board From Forcing Home Depot To Communicate A Pro-BLM Message

As explained, the Board's wildly overbroad interpretation of the NLRA finds no footing in the statute's text or the record. More fundamentally, though, the Board's theory violates the First Amendment. Home Depot has decided that

43

company aprons should not communicate political or ideological views at odds with the apolitical atmosphere Home Depot wishes to cultivate. The First Amendment fully protects that expressive judgment. This Court should either reject the Board's NLRA interpretation on constitutional avoidance grounds or uphold Home Depot's First Amendment defense on the merits. *See, e.g.*, *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575-78 (1988) (interpreting NLRA to avoid "serious" First Amendment issue). Either way, the Board's decision cannot stand.

### 1. Home Depot's Apron Policy Is Fully Protected By The First Amendment

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. That freedom encompasses "the decision of both what to say and what *not* to say." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796-97 (1988). The government thus cannot "compel a person to speak its message when he would prefer to remain silent" or "force an individual to include other ideas with his own speech that he would prefer not to include." *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023). Corporations enjoy this constitutional protection, *Citizens United v. FEC*, 558 U.S. 310, 342 (2010), which applies with full force in the labor context, *Janus*, 585 U.S. at 891-95.

The Board's interpretation of the NLRA to force Home Depot to carry Bo's BLM message on a customer-facing company apron violates the First Amendment.

44

At the most basic level, the Board's edict has impinged on Home Depot's constitutionally protected "autonomy to choose the content of [its] own message." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 573 (1995). That is because messages displayed on Home Depot aprons are *Home Depot's* speech. But even if the BLM message is characterized as both Home Depot's *and* Bo's speech—or even as exclusively Bo's speech—the Board's order still violates Home Depot's First Amendment rights.

a. The BLM message at issue—displayed on a Home Depot apron by a Home Depot associate interacting with Home Depot customers on Home Depot's behalf at a Home Depot store—is *Home Depot's* speech. The government cannot force Home Depot to communicate a message that Home Depot does not wish to express.

As the Supreme Court explained in *Janus*, "[w]hen an employee engages in speech that is part of the employee's job duties, the employee's words are really the words of the employer." 585 U.S. at 910. Here, Bo displayed BLM on a company apron, next to Home Depot's Values Wheel and other company expression, while interacting with customers and performing their "job duties." *Id.* Under *Janus*, Bo was acting as Home Depot's "spokesperson"—and Bo's BLM message was "really the words" of Home Depot. *Id.*

45

That reality undergirds Home Depot's apron policy, which reflects Home Depot's expressive choices about "what to say and what *not* to say." *Riley*, 487 U.S. at 796-97. Home Depot encourages employee-generated content that supports its chosen message—while forbidding political, religious, or other potentially divisive content that does not. The First Amendment fully protects those choices.

While any speaker has the constitutional prerogative to make such decisions for whatever reason they wish—or for no reason at all—Home Depot had compelling justifications for its apron policy. As discussed, those justifications include: (1) building a consistent public image, (2) fostering a welcoming store atmosphere, (3) keeping customers focused on home-improvement products, and (4) avoiding tension or outright confrontation with customers or among employees. *Supra* 35-38. By nevertheless ordering Home Depot to permit Bo's BLM display, the Board has compelled Home Depot to express—through a customer-facing employee—an overtly political message. That "direct regulation" of Home Depot's speech "plainly violate[s] the First Amendment." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013).

b. That the BLM message at issue here may also reflect *Bo's* speech—and not just Home Depot's—makes no difference. Forcing Home Depot to permit that display unconstitutionally distorts Home Depot's speech by changing the message its employees (and their aprons) communicate to the public on Home Depot's behalf.

46

Home Depot has a First Amendment right to control its chosen message. Home Depot exercises that prerogative by regulating the messages communicated by its iconic orange aprons. Home Depot chooses to allow *some* personalized messages—but only those that Home Depot has concluded are noncontroversial and reinforce the company's own expression. *Supra* 6-7, 20-21. The Board had no constitutional power to amend Home Depot's carefully crafted message by compelling Home Depot to accept Bo's BLM display on a company apron.

*Hurley* is directly on point. There, the Supreme Court held that the First Amendment protected parade organizers' right to exclude a gay-rights group from participating in their parade. 515 U.S. at 572-81. "Since every participating unit affects the message conveyed by the p[arade] organizers," the Court reasoned, forcing the organizers to permit the group's gay-rights "banner" would "essentially requir[e]" them to "alter the expressive content of their parade," in violation of the organizers' First Amendment rights. *Id.* at 572-73. The Court recognized that the gay-rights group "understandably s[ought] to communicate its [own] ideas as part of the existing parade," but that made no difference. *Id.* at 570. The organizers had chosen "not to propound a particular point of view, and that choice" was "beyond the government's power to control." *Id.* at 575.

Home Depot has made the same kind of expressive choice and is entitled to the same constitutional protection. Just as "every participating unit [in a parade]

47

affects the message conveyed by the [parade] organizers," so too does every participating employee who customizes their apron affect the message conveyed by Home Depot. *Id.* at 572-73. And like the parade spectators in *Hurley*, Home Depot customers would understand Bo's BLM display to shape Home Depot's overall message. *Supra* 41. Forcing Home Depot to accept the BLM display would thus "essentially requir[e]" Home Depot to "alter the expressive content" of its aprons, in violation of Home Depot's First Amendment rights. *Id.* It makes no difference that Bo *also* "s[ought] to communicate" their own "ideas" on a company apron. *Id.* at 570. Home Depot's expressive choice lies beyond the Board's power to control. *Id.* at 574-75.

The First Amendment violation here is even more glaring than in *Hurley*. There, the parade organizers had "been rather lenient in admitting participants to its parade," yet they did not "forfeit constitutional protection simply by" making unexplained or inconsistent editorial decisions. *Id.* at 558. Here, Home Depot has carefully curated the message communicated by its aprons, and the company permits personalized expression *only* to the extent that expression supports Home Depot's apolitical communicative goals. *Supra* 6-7, 20-21. The Supreme Court upheld the *Hurley* parade organizers' First Amendment right to exclude certain expression despite the organizers' "fail[ure] to edit their themes to isolate an exact message."

48

515 U.S. at 569-70.  Home Depot has the same right, especially given the care with which it has crafted its chosen message.

c.  Even if the BLM display is somehow *exclusively* Bo's speech—and not also Home Depot's—the Board's order violates the First Amendment all the same. The "government still compels speech when it" takes action "that has the effect of foisting a third party's message" onto someone else.  *Telescope*, 936 F.3d at 753. The Board cannot "foist[]" Bo's personal speech on Home Depot.  *Id.*

The Supreme Court's decision in *Wooley v. Maynard*, 430 U.S. 705 (1977), makes that clear.  There, the Court held that the First Amendment barred New Hampshire from requiring drivers to display license plates emblazoned with the slogan "Live Free or Die."  *Id.* at 707, 713.  It explained that the government may not command a person "to participate in the dissemination of an ideological message by displaying it on his private property in a manner and for the express purpose that it be observed and read by the public."  *Id.* at 713.  Under *Wooley*, people may not be forced to "use their private property as a 'mobile billboard' for" someone else's "ideological message," regardless of whether they themselves are speaking or just driving down the street.  *Id.* at 715.

The Court took the same approach in *Pacific Gas & Electric Co. v. Public Utilities Commission of California*, 475 U.S. 1 (1986).  There, it held that a California agency violated the First Amendment by requiring a private utility

company to include a third party's newsletter criticizing the company in the company's billing envelope. *Id.* at 12-15. Doing so impermissibly forced the company to "assist in disseminating" someone else's speech. *Id.* at 15.

This case is just like *Wooley* and *Pacific Gas*. The Board has no more power to conscript Home Depot into broadcasting a private "ideological message" than New Hampshire did to dragoon drivers' cars into acting as "mobile billboard[s]" for someone else's slogan in *Wooley*, 430 U.S. at 715—or than California did to demand "assist[ance] in disseminating" someone else's newsletter in *Pacific Gas*, 475 U.S. at 14-15. Home Depot's iconic orange apron is "a billboard to advertise for Home Depot"—not for BLM, Blue Lives Matter, or any other employee-favored message Home Depot chooses not to express. App.381/R.819. The First Amendment fully protects Home Depot's right not to address potentially controversial political and social topics.

### 2. The Board's First Amendment Analysis Is Indefensible

The Board's cursory First Amendment analysis does not withstand scrutiny. The Board repeatedly flouted hornbook First Amendment principles and binding Supreme Court precedent. It mischaracterized the evidence before it. And it badly exaggerated the consequences of accepting Home Depot's well-supported position. Every rationale the Board gave for brushing aside the First Amendment is mistaken.

50

a. The Board first opined that no government-compelled message is even at issue here, because "it is [Bo's] desired message that is being conveyed, not the government's." App.833/R.2166. That makes no sense. The Board's whole theory is that *the NLRA* requires Home Depot to allow the BLM display because of its supposed connection to protected labor activity. A statute controlling Home Depot's expression in this way is obviously subject to the First Amendment. The only reason Bo's speech is being compelled is because the Board has interpreted the NLRA to require that result.

*Hurley* is again instructive. There, the particular message that the parade organizers wished not to express belonged to the gay-rights group, not the government. 515 U.S. at 561, 572-73. Yet the First Amendment was implicated all the same, because a Massachusetts anti-discrimination law had been invoked to force the organizers to embrace that message in their parade. *Id.* at 571-73; *accord Pac. Gas*, 475 U.S. at 6, 14-15 (unconstitutionally compelled messages belonged to private interest group). *Whenever* the government forces someone to speak— whether the message belongs to the government or to someone else—the First Amendment intercedes. *See Telescope*, 936 F.3d at 753.

b. The Board also denied that a customer-facing employee displaying "BLM" on a Home Depot apron communicates on Home Depot's behalf, asserting that that the BLM message "[wa]s the statutorily protected message chosen by an employee."

51

App.833/R.2166. That logic is doubly flawed. For one thing, the Board cannot absolve itself of First Amendment scrutiny merely by claiming that a federal statute authorizes a speech restriction. Simply put, the NLRA cannot trump the First Amendment. *See Hurley*, 515 U.S. at 571 (upholding as-applied challenge to a "venerable" civil rights law).[6] Whether the NLRA protects Bo's conduct has no bearing on the constitutional analysis.

In addition, the Board's insistence that the BLM display was exclusively Bo's speech directly contradicts the Supreme Court's recognition that "[w]hen an employee engages in speech that is part of the employee's job duties," the employee acts as the employer's "spokesperson" whose "words are really the words of the employer." *Janus*, 585 U.S. at 910. It also contradicts the evidence in this case, which confirms that the public and other employees reasonably attribute messages displayed on Home Depot aprons to Home Depot. *Supra* 41; App.205/R.230; App.307/R.442. And even if others saw the BLM message as only Bo's speech, Home Depot *still* could not be forced to disseminate that message under *Wooley* and *Pacific Gas*. *Supra* 49-50.

Relatedly, the Board claimed that, under *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.* ("*FAIR*"), 547 U.S. 47 (2006), ordering Home Depot to

---

6   Congress recognized as much by generally shielding employers from NLRA liability when they express "views, argument, or opinion." 29 U.S.C. § 158(c).

Appellate Case: 24-1406     Page: 63     Date Filed: 05/24/2024 Entry ID: 5397617

"accommodat[e]" Bo's "message does not affect [Home Depot's] speech" or otherwise "impermissibly compel[] it to serve as an unwilling conduit for employees' speech." App.833/R.2166. But this case is miles away from *FAIR*, which held that law schools may be required to let military recruiters operate on their campuses. 547 U.S. at 70. Nothing about that arrangement, the Supreme Court explained, "suggests that law schools agree with any speech by recruiters." *Id.* at 65; *see PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 87 (1980) (similar). By contrast, adorning Home Depot aprons with political or social messages *does* suggest that Home Depot endorses those messages. Indeed, Home Depot uses its aprons to communicate the company's brand and core values to customers.

c.  The Board also asserted that its order does not even implicate the First Amendment because it "affects what [Home Depot] must *do*," "not what [it] may or may not *say*." App.833/R.2166 (emphasis added). This too makes no sense. In *Hurley*, the state court had ordered the parade organizer to *do* something—permit a gay-rights group to march and display a banner. 515 U.S. at 572-73. Yet the First Amendment still applied, because requiring such action would compel the organizers "to alter the expressive content of their parade." *Id.*; *accord Pac. Gas*, 475 U.S. at 14-15 (First Amendment prohibits requiring a company to mail an unwanted message). The Board's order here does the exact same thing: It compels Home Depot to alter the expressive content of its aprons.

53

d.   Finally, the Board declared that enforcing the First Amendment here "would abrogate decades of court and Board precedent, insofar as it would broadly permit employers to suppress activity protected by Section 7 simply because the employer did not approve of it."  App.832-33/R.2165-66.  It is unclear what "decades of court and Board precedent" the Board was referencing.  *Id.*  The Board mustered only two cases—*Republic Aviation*, and *American Medical Response West*, 370 NLRB No. 58, slip op. at 1, 7 (2020)—but neither even mentions the First Amendment.  And unlike here, the disputed messages in those cases concerned issues with an "immediate, significant, and direct impact" on the workplace. *American Med.*, 370 NLRB No. 58, slip op. at 7 (opposing on-call work during breaks); *see Republic Aviation*, 324 U.S. at 795 (supporting union membership). In fact, as the Board itself told the Supreme Court, a compelled-speech argument "has not been considered by the Board or a court in the context of workplace insignia in *any* case."  NLRB Opp. Br. 9, *In-N-Out Burger, Inc. v. NLRB*, No. 18-340 (U.S. Jan. 24, 2019), *cert. denied*, 139 S. Ct. 1259 (2019).  That lack of First Amendment precedent underscores the unprecedented nature of the Board's decision in this case.

To the extent the Board fears that ruling for Home Depot on First Amendment grounds would give employers carte blanche to flout the NLRA in other circumstances, that concern is misplaced.  This is an as-applied challenge, involving speech that is—at best—only tenuously connected to NLRA concerns.  *Supra* 25-28.

54

This case does not present potentially harder issues about how the First Amendment intersects with employee messages that arguably have a closer nexus to workplace issues—like "pro-union pins," *Starbucks*, 679 F.3d at 73, or "buttons" supporting a higher "minimum wage," *In-N-Out*, 894 F.3d at 711.

If the Board wants to compel Home Depot to permit Bo's BLM display, the Board must satisfy strict scrutiny. *See Telescope*, 936 F.3d at 754. The Board, however, has never tried to meet that standard. Nor could it: There is no compelling government interest in forcing Home Depot to disseminate a private political message, and there were many alternative avenues for Bo to express their views, including while on the job. *E.g.*, App.476/R.1141; App.492-93/R.1157-58. The clear First Amendment problem on these facts cannot be ignored.

## II. AT A MINIMUM, THE BOARD'S IMPERMISSIBLY BROAD CEASE-AND-DESIST ORDER CANNOT STAND

Even if the Board's decision is upheld, its sweeping cease-and-desist order must still be vacated or narrowed. *See* 29 U.S.C. § 160(e)-(f). The Board's analysis concluded—on the particular facts presented here—that the NLRA protected Bo's BLM display only because the display was tied to prior concerted advocacy about the Gumm and Black History Month incidents at the New Brighton store. App.826-29/R.2159-62. Yet the Board's cease-and-desist order goes much further, apparently directing Home Depot to allow *any* BLM display on company aprons and prohibiting Home Depot from violating the NLRA in ways totally unrelated to the

55

alleged violations at issue. *See* App.838/R.2171. The Board's sweeping decree cannot stand.

1. Cease-and-desist orders issued by the Board must "conform to the violations which the evidence reveal[ed]." *NLRB v. Int'l Longshoremen's & Warehousemen's Union, Loc. 10*, 283 F.2d 558, 568 (9th Cir. 1960); *accord NLRB v. Windsor Castle Health Care Facilities, Inc.*, 13 F.3d 619, 624 (2d Cir. 1994). The NLRA requires "that a proposed remedy be tailored to the unfair labor practice it is intended to redress." *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 900 (1984). So "when the Board 'narrow[s] the case for decision purposes,' it may not then 'broaden it to the widest possible limits for purposes of remedy.'" *Mercedes-Benz U.S. Int'l, Inc. v. Int'l Union, UAW*, 838 F.3d 1128, 1148 (11th Cir. 2016) (alteration in original). Thus, "[b]road language in an injunction that essentially requires a party to obey the law in the future" is almost always impermissible. *Calvin Klein Cosmetics Corp. v. Parfums de Coeur, Ltd.*, 824 F.2d 665, 669 (8th Cir. 1987); *see* Fed. R. Civ. P. 65(d)(1)(B)-(C).

Enforcing these limits is especially important because, when a court enters an "order enforcing the Board's [cease-and-desist] order," the order becomes "an injunction" that is "enforceable by contempt." *NLRB v. P*I*E Nationwide, Inc.*, 894 F.2d 887, 893 (7th Cir. 1990). Courts must scrutinize the scope of the Board's orders, so as to avoid later having to police "violations of all the provisions of the

56

[NLRA] merely because the violation of one has been found." *NLRB v. Express Publ'g Co.*, 312 U.S. 426, 433, 437 (1941). "Congress did not contemplate that the courts should, by contempt proceedings, try alleged [NLRA] violations" that "are not similar or fairly related to the unfair labor practice which the Board has found." *Id.* at 435; *accord NLRB v. Beth Israel Hosp.*, 554 F.2d 477, 483 (1st Cir. 1977); *Morrison-Knudsen Co. v. NLRB*, 276 F.2d 63, 76 (9th Cir. 1960).

2. Here, the Board's cease-and-desist order purports to bar Home Depot from (1) "[p]rohibiting its employees from engaging in protected concerted activities, including by displaying BLM or Black Lives Matter markings on their aprons"; (2) "[a]pplying its dress code apron policy to restrict employees in the exercise of their Section 7 rights"; (3) "[c]onstructively discharging employees by confronting them with a choice between abandoning their Section 7 rights and resigning their employment"; and (4) "[i]n any like or related manner interfering with, restraining, or coercing employees in the exercise of [Section 7] rights." App.838/R.2171. That order is overbroad in at least two significant respects.

*First*, it is an obviously improper obey-the-law injunction. *Calvin Klein*, 824 F.2d at 669. The Board's order directs Home Depot to comply "with Section 7" in its entirety. App.838/R.2171. By seeking enforcement in this Court, the Board has sought a judicially enforceable injunction to that effect. While Home Depot strives to comply with all its legal obligations, this order—as written—subjects Home

Appellate Case: 24-1406    Page: 68    Date Filed: 05/24/2024 Entry ID: 5397617

Depot to "the peril of a summons for contempt" anytime the Board alleges that Home Depot has violated Section 7 in any way, at any time. *Express Publ'g*, 312 U.S. at 436. Such a draconian remedy may issue *only* if an employer's "misconduct" was especially "persistent and widespread." *Federated Logistics & Operations, a Div. of Federated Corp. Servs., Inc. v. NLRB*, 400 F.3d 920, 929 (D.C. Cir. 2005). The Board neither alleged nor proved anything like that here.[7]

*Second*, the Board's directive that Home Depot cease "[p]rohibiting its employees from engaging in protected concerted activities, including by displaying BLM or Black Lives Matter markings on their aprons" seems to treat *any* display of BLM as protected, concerted activity. App.838/R.2171. That too is improper. The Board's fact-bound decision addressed whether Bo's particular "BLM" display was sufficiently tied to two specific workplace issues at one Hope Depot store—i.e., the Gumm and Black History Month incidents. App.826-29/R.2159-62. The Board properly declined to accept the General Counsel's broader theory that "protests of workplace racial discrimination are inherently concerted under [the NLRA]."

---

[7] The Board's sweeping order could be read to apply either only to the New Brighton store, or nationwide. Home Depot's understanding is that the order's prohibitions apply only to New Brighton, given the decision's fact-intensive analysis, the cease-and-desist order's prefatory reference to "New Brighton, Minnesota," and a "notice-posting" requirement applying only to the New Brighton store. App.829/R.2162; App.838/R.2171. But if the Board intended nationwide application, that only underscores the improper breadth of the cease-and-desist remedy—and bolsters the case for vacatur.

App.828 n.23/R.2161 n.23.  The Board's case-specific reasoning cannot support its sweeping order.  *See Mercedes-Benz*, 838 F.3d at 1148; *Sure-Tan*, 467 U.S. at 900.

Accordingly, even if the Court upholds the Board's decision, it must narrow the Board's remedial order.  At most, the Board can direct Home Depot to cease and desist from prohibiting *Bo's* BLM display or other displays in substantially similar circumstances at the New Brighton store.  It cannot go further in restricting Home Depot's choice of expression communicated on company aprons.

Appellate Case: 24-1406     Page: 70     Date Filed: 05/24/2024 Entry ID: 5397617

## CONCLUSION

This Court should grant the petition, deny the Board's cross-application for enforcement, and set aside the Board's decision and order. In the alternative, the Court should vacate or modify the Board's cease-and-desist order.

Dated: May 24, 2024

Respectfully submitted,

*/s/ Roman Martinez*

C. Thomas Davis
Keith D. Frazier
Brian E. Hayes
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
401 Commerce Street
Suite 1200
Nashville, TN 37219
(615) 254-1900

Roman Martinez
Brent T. Murphy
Joseph E. Sitzmann
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200
roman.martinez@lw.com

Nicholas Rosellini
LATHAM & WATKINS LLP
505 Montgomery Street
Suite 2000
San Francisco, CA 94111
(415) 391-0600

*Counsel for Petitioner/Cross-Respondent Home Depot U.S.A., Inc.*

## CERTIFICATE OF COMPLIANCE

The foregoing brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 13,000 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word with 14-point Times New Roman font.


Dated: May 24, 2024                              */s/ Roman Martinez*
                                                 Roman Martinez

## CERTIFICATE OF SERVICE

I hereby certify that on May 24, 2024, pursuant to Fed. R. App. P. 25(a)(2)(A)(ii), I caused the foregoing brief to be filed electronically with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit. Within five days of receipt of notice that the foregoing document has been filed, Petitioner/Cross-Respondent Home Depot U.S.A., Inc. will serve each party separately represented with a paper copy of the brief.

I further certify that ten paper copies of Opening Brief for Petitioner/Cross-Respondent Home Depot U.S.A., Inc. will be provided to the Court within five days after receipt of notice that the foregoing document has been filed pursuant to Rule 28A(d).

Joel Abraham Heller
National Labor Relations Board
1015 Half Street, SE
Washington, DC 20570

*Counsel for Respondent/Cross-Petitioner*
*National Labor Relations Board*


*s/ Roman Martinez*
Roman Martinez